USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9-13-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY,

                    **Plaintiff.**

-v.-

U.S. DEPARTMENT OF HOMELAND
SECURITY, ET AL.,

                    **Defendants.**

------------------------------------------------------------x

1:17-cv-7572 (ALC)

**OPINION & ORDER**

**ANDREW L. CARTER, JR., United States District Judge**

Plaintiff the Knight First Amendment Institute at Columbia University (the "Knight Institute" or "Institute") filed this action under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking several categories of documents from the United States Immigration and Customs Enforcement ("ICE"), the Office of Legal Counsel ("OLC") within the Department of Justice ("DOJ"), the Department of State ("DOS"), the United States Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), Department of Homeland Security ("DHS"), Department of Justice Office of Public Affairs ("OPA"), and Office of Information Policy ("OIP") (collectively "Defendants"). Specifically, Plaintiff filed identical FOIA requests (the "Request") seeking records relating to the government's authority to exclude or remove individuals from the United States based on their speech, beliefs, or associations—including its authority to conduct the kind of "extreme ideological vetting" President Trump threatened during his 2016 presidential campaign and delivered shortly after taking office. ECF. No. 1. The parties' cross-motions for partial summary judgment are now

1

The INA provisions relevant here make inadmissible any individual who "endorses or espouses terrorist activity" or whose presence in the United States may pose foreign policy concerns.[1] The INA also provides that any "alien whose entry or proposed activities in the United States . . . would have serious adverse foreign policy consequences . . . is inadmissible," even when that determination is based on "beliefs, statements or associations [that] would be lawful within the United States." 8 U.S.C. §§ 1182(a)(3)(C)(i), (a)(3)(C)(iii).[2]

## II. Executive Orders 13769 and 13780

On January 27, 2017, the president issued Executive Order ("E.O.") 13769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States." 82 Fed. Reg. 8977.[3] After the Ninth Circuit upheld a temporary restraining order enjoining portions of E.O. 13769,[4] the president promised to "go[ ] further" with a new executive action, and assured that "[e]xtreme vetting will be put in place," and that "it already is in place in many places." The president then issued E.O. 13780; rescinding E.O. 13769 in its entirety. 82 Fed. Reg. 13209, 13218 (March 6, 2017).[5]

After declaring that only individuals who "want to love our country" should be admitted into the United States,[6] the president ordered the Secretary of State, the Attorney General, the

---

[1] Specifically, the INA provides that "[a]ny alien who . . . endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization," 8 U.S.C. § 1182(a)(3)(B)(i)(VII), or who "is a representative of . . . a political, social, or other group that endorses or espouses terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(i)(IV)(bb), is inadmissible. *See also* 8 U.S.C. § 1225(c) (expedited removal of arriving aliens on same grounds); 8 U.S.C. § 1227(a)(4)(B) (removal of admitted aliens on same grounds); 8 U.S.C. § 1158(b)(2)(A)(v) (removal of refugees otherwise qualified for asylum on similar grounds) (collectively, the "endorse or espouse provisions" of the INA).
[2] *See also* 8 U.S.C. §§ 1225(c)(1), 1227(a)(4)(C) (removal on same grounds) (together, the "foreign policy provisions" of the INA).
[3] *See Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *2 (W.D. Wash. June 21, 2017).
[4] *See Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).
[5] Stephen Miller, the president's Senior Advisor stated that E.O.13780 would have "the same basic policy outcome for the country." *Wagafe*, 2017 WL 2671254, at *2. The president's Press Secretary stated that the goal of E.O. 13780 was "obviously to maintain the way we did it the first time." *Id.*
[6] *Trump Defends Immigration Restrictions, Wants People "Who Love Our Country,"* Chi. Trib. (Feb. 6, 2017), http://trib.in/2vIQeuw

records discussing, interpreting, or providing guidance regarding such sections;

**Item 6(a)**: All statistical data or statistical reports created since January 19, 2012, regarding the application, waiver, or contemplated application or waiver of the endorse or espouse provisions, or of the foreign policy provisions as they relate to "beliefs, statements or associations," to exclude or remove individuals from the United States; and

**Item 6(e)**: All notifications or reports created since May 11, 2005 from the Secretary of Homeland Security or the Secretary of State concerning waivers of the endorse or espouse provision pursuant to 8 U.S.C. § 1182(d)(3)(B)(ii).

*See* Joint Status Report ("JSR") ¶ 2, ECF No. 48; Decl. of Carrie DeCell ("DeCell Decl.") ¶¶ 7–8. The parties agreed that Defendants would search for records responsive to each item with the following exceptions: 1) Defendants would search only White House systems for records responsive to Item 1, providing "an explanation of the White House record retention policy so the Knight Institute could assess the comprehensiveness of the response to this Item of the Request," (JSR ¶ at 2(a)); 2) only DOS would search for records responsive to Item 5; and 3) only DHS and DOS would search their respective Office of the Secretary systems for records responsive to Item 6(e). *Id.* at ¶ 2.

### IV.  Defendants' Responses

Defendants produced records by July 2018. In August 2018, the Knight Institute requested that Defendants provide draft search descriptions and *Vaughn* indices explaining these records.[7] ECF No. 79; DeCell Decl. ¶ 24. Defendants' responses are detailed below:

**ICE**: On September 29, 2017, ICE sent the Knight Institute a "final response" letter quoting language in Item 1. ECF No. 42-3. ICE also released 1,666 pages of records but

---

[7] *Vaughn* indices "require[] agencies to itemize and index the documents requested, segregate their disclosable and non-disclosable portions, and correlate each non-disclosable portion with the FOIA provision which exempts it from disclosure." *Brennan Ctr. for Justice v. U.S. Dep't of State*, 300 F. Supp. 3d 540, 547 (S.D.N.Y. 2018) (quotation omitted); *see also ACLU v. U.S. Dep't of Justice*, 844 F.3d 126, 129 n.4 (2d Cir. 2016); *Vaughn v. Rosen*, 484 F.2d 820, 826-28, 157 U.S. App. D.C. 340 (D.C. Cir. 1973). Thus, agencies submit *Vaughn* indexes listing withheld documents and claimed exemptions, along with *Vaughn* affidavits that describe the withheld documents and the rationale for withholding them. *See ACLU v. DOJ*, No. 13 Civ. 7347, 2017 U.S. Dist. LEXIS 44597, 2016 WL 5394738, at *4 (S.D.N.Y. Sept. 27, 2016).

claims in oral argument on July 31, 2019. ECF No. 128.

As to ICE and OLC, Plaintiff claims each agency failed to establish the adequacy of their searches for responsive records. Specifically, Plaintiff challenges the adequacy of ICE's search methods and affidavits, but only challenges OLC's decision not to search the White House for responsive records. ICE and OLC contend they conducted reasonable and diligent searches, searching multiple offices, components and locations reasonably likely to have records responsive to Plaintiff's FOIA request. On August 7, 2019, ICE submitted supplemental information regarding the searches conducted by ICE's Office of the Director and the ERO.[8] ECF No. 132. The Knight Institute filed a letter in response on August 14, 2019. ECF No. 136.

As to DOS, Plaintiff argues the agency failed to justify its withholding of responsive records pursuant to FOIA Exemptions 5 and 7(E). DOS claims it justifiably withheld certain documents in full or in part pursuant to FOIA Exemptions 5 and/or 7(E), and thus is entitled to summary judgment. 5 U.S.C. §§ 552(b)(5), (b)(7)(E).

## STANDARD OF REVIEW

### I. Summary Judgment

Summary judgment is the usual mechanism for resolving a FOIA action. *Families for Freedom,* 797 F. Supp. 2d at 385. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. There is no issue of material fact where the facts are irrelevant to the

---

[8] This included a declaration of Alexander Choe ("Choe Decl."), Administrative Specialist in the Office of the Director and the declaration of Eliman Jussara Solorzano ("Solorzano Decl."), Special Assistant in the Enforcement, Removal and Operations office. ECF Nos. 133-134.

disputed record.'" *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (citing *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). Agency affidavits, however, must describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure—conclusory assertions are insufficient. *Bloomberg LP v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009) (citing *Halpern v. F.B.I.*, 181 F.3d 279, 291 (2d Cir. 1999)).[9]

In sum, courts may award summary judgment on the basis of agency affidavits that "[1] describe the justifications for nondisclosure with reasonably specific detail, [2] demonstrate that the information withheld logically falls within the claimed exemption, and [3] are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009). Conversely, "[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *N.Y. Times Co. v. United States Dep't of Justice*, No. 14CIV03776ATSN, 2016 WL 5946711, at *5 (S.D.N.Y. Aug. 18, 2016) (citing *Bloomberg*, 649 F.Supp.2d at 271).

## DISCUSSION

### I. Search Adequacy

### A. Legal Standard

An agency bears the burden to "show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Nat'l Day Laborer Org.*

---

[9] "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden," *Larson v. Dep't of State*, 565 F.3d 857, 864, 385 U.S. App. D.C. 394 (D.C. Cir. 2009).

9

App'x 648 (2d Cir. 2010). Speculation that other documents exist, without more, "does not undermine [a] finding that the agency conducted a reasonable search." *Conti*, 2014 U.S. Dist. LEXIS 42544, at *30 (quoting *Garcia*, 181 F. Supp. 2d at 366).

### B. Application: ICE's Search

ICE contends it identified four components within the agency likely to have records responsive to Plaintiff's FOIA request – Enforcement and Removal Operations ("ERO"), Office of Principal Legal Advisor ("OPLA"), Office of Policy, and the Office of the Director – because those components relate to the crux of Plaintiff's FOIA request: operations concerning the exclusion or removal of individuals. ECF No. 91("Fuentes Decl.") ¶¶ 16-30. OPLA also directed five additional offices or divisions to search for responsive records: Immigration Law and Practice Division ("ILPD"), National Security Law Section ("NSLS"), Enforcement and Removal Operations Law Division ("EROLD"), Field Legal Operations ("FLO") and Deputy Principal Legal Advisor ("DPLA"). *Id.* at ¶¶ 18-24. In each office or division a point of contact ("POC") determined the locations likely to contain responsive documents; attorneys, senior staff members, and in some cases the entire division then conducted the searches. *Id.* ICE searched government computers either manually or with various search terms. *Id.* at ¶¶ 17-30.[11]

ICE believes these facts entitle it to summary judgment since it reasonably identified multiple offices within the agency likely to possess responsive records, reasonably

---

[11] ICE used the following search terms: "Association," Foreign Affairs Manual," "Gang Association," "Foreign Policy Provision," "Beliefs," "Speech," "Memorandum," "waiver," "White House," and "ICE Policy." The documents found to be responsive were provided to ICE FOIA on December 6, 2017. Additionally, Special Counsel to the DPLA searched the DPLA's government computer (including personal and shared drives) and Outlook e-mail account, using the following search terms: "endorse," espouse," and "eop.gov." Fuentes Decl. ¶ 17-30.

for responsive records, not rely on memories. *See* 5 U.S.C. § 552(a)(3); Am. Compl. Ex. B, at 3.

ICE cites *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) to defend its search. There, the D.C. Circuit found a search adequate where the agency actively looked for responsive records, investigated the accidental destruction of some records, and conducted an "unavailing room-to-room search for the box of missing documents" anyway. 926 F.2d at 1201. Here, EROLD did not perform a similar hunt, raising "serious doubts as to the completeness of the agency's search." *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 96 (citation omitted). Thus, *SafeCard Services, Inc.* is inapposite.

Furthermore, ICE's affidavits provide an inadequate amount of detail. *See Gelb*, 2014 WL 4402205, at *4 (explaining that an agency's affidavit "must describe in reasonable detail the scope of the search and the search terms or methods employed"). Specifically, ICE provided no description of the search terms used by custodians in the ILPD and NSLS. Fuentes Decl. ¶¶ 20–22.

Moreover, ICE also failed to establish that the search terms used were expansive. The searches run by the Office of the Director and ERO were too restrictive to be reasonably calculated to uncover all responsive records. *See Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 95.

For example, The Office of the Director's use of search terms "endorse provision" and "espouse provision," was unreasonably narrow given the breadth of Plaintiff's request. Fuentes Decl. ¶ 28. Plaintiff points out that it used its own defined shorthand phrases—specifically, the "endorse or espouse provisions"—to refer to numerous statutory provisions collectively throughout the Request. *See* ECF No. 42-2, at 3; *id.* at 3

13

'recite facts which enable the District Court to satisfy itself that all appropriate files have been searched.'" (quotations omitted). Therefore, because the Office of the Director failed to search for additional terms the agency itself would have used in referring to the relevant statutory provisions—and offers no reasonable justification to support its decision—ICE has not established the adequacy of the Office of the Director searches.

Similarly, ERO's search was unreasonable because it did not include keywords—like "endorse" and "espouse"—from the INA. *See Id.* at ¶ 30. Furthermore, ERO's use of terms such as "removal policies," "removal terrorist," "removal speech," "removal belief," and "removal association" are not reasonably calculated to return relevant records. ERO's search terms seem especially deficient when compared to the terms used by DOS and OLC. *See* Stein Decl. ¶¶ 19, 22–23; Colborn Decl. ¶ 10, ECF No. 92.

Finally, ICE's contention that its search returned responsive documents holds little weight since a FOIA search's adequacy is not determined "by the fruits of the search". *Schwartz,* 2017 U.S. Dist. LEXIS 2316, at *26 (quoting *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 315, 354 U.S. App. D.C. 230 (D.C. Cir. 2003)).

In sum, ICE's affidavit fails to establish adequacy by omitting key details about the search terms used, how the agency handled the administrative remand, and how the agency narrowed its search results. It is "patently incomplete." *See Nat'l Day Laborer Org. Network,* 877 F. Supp. 2d at 96 (citation and internal quotation marks omitted). Additionally, the searches run by the Office of the Director and ERO were not calculated to uncover all relevant documents. *See Id.* at 95. Thus, ICE's motion for partial summary judgment is DENIED and Plaintiff's cross motion for partial summary judgment is GRANTED. ICE must conduct new searches. The parties should meet and confer and

agencies. *Jones-Edwards v. Appeal Bd. of NSA*, 196 F. App'x 36, 38 (2d Cir. 2006).[14]

FOIA applies to "agency records." 5 U.S.C. § 552(a)(4)(B); *see also DOJ v. Tax Analysts*, 492 U.S. 136, 142 (1989); *FLRA v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992). Under FOIA, agency records are materials "created or obtained by the agency to which the FOIA request was made" and "under that agency's control at the time the FOIA request is made". *Bloomberg*, 649 F. Supp. 2d at 275 (citing *Tax Analysts*, 492 U.S. at 144-45)), aff'd, 601 F.3d 143 (2d Cir. 2010). Since FOIA "only obligates [agencies] to provide access to [agency records] it in fact has created and retained," *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980), an agency is not required to search for records outside its possession or control". *Jones-Edwards* 196 F. App'x at 38. Indeed, as a practical matter, one agency does not have access to another agency's records systems. Therefore, as a matter of law, OLC was not obliged to search White House records. *See Jones-Edwards*, 196 F. App'x at 38 (finding an agency conducted an adequate search and the agency was not obligated to expand its search to encompass "domestic and international networks" outside its control).

Furthermore, the Colborn Declaration demonstrates that OLC conducted an adequate search regarding Plaintiff's Narrowed Request. The affidavit pointed out that OLC searched the central storage system containing "all final unclassified written legal advice," which, since "OLC attorneys use this database to perform internal research," is kept "as complete as possible." Colborn Decl. ¶¶ 8, 10. Moreover, after receiving one document from the State Department, OLC staff "revisited the search of [the] Perceptive

---

[14] *Sonds v. Huff*, 391 F. Supp. 2d 152, 160 (D.D.C. 2005), aff'd, 2006 WL 3093808 (D.C. Cir. 2006) (agency is "not required to respond to a FOIA request that should be directed to another agency.")

17

describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure—conclusory assertions are insufficient." *N.Y. Times Co. v. CIA*, 314 F. Supp. 3d 519, 525 (2018).

### A. Exemption 5 and The Deliberative Process Privilege: Legal Standard

Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *Dep't of Interior & Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 149 L. Ed. 2d 87 (2001). Agencies may withhold documents that originate from a government agency and are susceptible to normal discovery rule privileges. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975); *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800, 104 S. Ct. 1488, 79 L. Ed. 2d 814 (1984); *Spadaro v. United States Customs & Border Prot.*, No. 16-cv-16 (RJS), 2019 U.S. Dist. LEXIS 50273, at *14 (S.D.N.Y. Mar. 26, 2019) (citing *Grand Cent. P'ship*, 166 F.3d at 481)

An apparently privileged document may nevertheless be subject to disclosure "if it closely resembles that which FOIA affirmatively requires to be disclosed: 'final opinions . . . made in the adjudication of cases,' 'statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,' and 'administrative staff manuals and instructions to staff that affect a member of the public.'" *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 613 (S.D.N.Y. 2018) (quoting *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 195 (2d Cir. 2012) (quoting 5 U.S.C. § 552(a)(2)(A)-(C)).

author prepared the document to assist the agency official charged with making the decision, and (iii) verify that the document precedes the related decision. *Seife*, 298 F. Supp. 3d at 630 (quoting *Nat'l Congress for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y. 2000).

The deliberative process privilege does not apply to documents that embody law and policy. *Sears*, 421 U.S. at 152–53, 161; *Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576, 593 (2d Cir. 2019) ("*ACLU v. NSA*").[16] The theoretical distinction between pre-decisional advice and post-decisional explanation may not be clear in practice. For example, a document advising an agency leader how to interpret a statute may seem identical to a letter informing an agency subordinate how to interpret a statute. *See Id.* Realizing this potential conflation, The Second Circuit recently explained the following doctrines to help courts determine if a document is privileged under Exemption 5: "working law" describes post-decisional material, and "express adoption" and "incorporation by reference describe two methods by which pre-decisional material can become post-decisional." *Id.*[17] "[I]t is the government's burden to prove" that the Exemption 5 privileges apply. *Brennan Ctr.*, 697 F.3d at 201–02.

---

[16] The deliberative process privilege protects "communications received by the decisionmaker on the subject of the decision prior to the time the decision is made" to ensure that the subsequent decision will be fully informed. *ACLU v. NSA*, 925 F.3d at 593 (quoting *Sears*, 421 U.S. at 151-53, 95 S.Ct. 1504). By contrast, there is little need to preserve the confidentiality of discussions rendered as the agency's "effective law and policy." *Id.* A record "more properly characterized as an opinion or interpretation which embodies the agency's effective law and policy" is considered "working law" and, given "a strong congressional aversion to secret agency law" and "an affirmative congressional purpose to require disclosure of documents which have the force and effect of law," is not privileged. *Id.*; *see also Brennan*, 697 F.3d at 195, 196 (internal quotation marks, alterations, and citations omitted).

[17] The Second Circuit also offered the following guideline principles to determine if a document constitutes "working law": whether agency officials feel free to disregard the document's instructions; whether an agency superior distributes the document to subordinates (rather than vice versa); whether agency superiors direct their subordinates to follow the document's instructions; whether the document is applied in the agency's dealings with the public; and whether failure to follow a document's instructions provides cause for professional sanction. *ACLU v. NSA*, 925 F.3d at 595. These factors indicate whether a document has become binding on agency officials and therefore represents an agency's "effective law and policy." *Id.*

Similarly, DOS claims the Section 12(d)(3)(B)(i) legal opinion provided "non-binding" analysis and presents "different viable legal interpretations" (*Id.* at ¶ 7), and the AAS Memo contains analysis of the NSC's "legal views on a proposed exemption under INA § 212(d)(3)(B) for material support provided to a terrorist organization under duress," and analysis that "did not bind the Department to take an action" *Id.* at ¶ 8.

Despite each document's pre-decisional appearance, Plaintiff claims DOS failed to demonstrate the documents are not "working law". Specifically, Plaintiff claims DOS's statements do not allow the Court to determine whether DOS or the President adopted the reasoning provided in these records as their own, or whether DOS treats the records as having the force and effect of law. However, Plaintiff expands the boundaries of the "working law" doctrine too far. The Second Circuit considers a document as "working law" only when it operates as functionally *binding* authority on agency decision-makers. Here, the Stein declaration repeats similar language for each record at issue: "To the best of my knowledge, the analysis has not been publicly adopted formally or informally. The document offers legal analysis of a range of possible policy options, and this analysis was not binding on the Department or the President" Suppl. Stein Decl. ¶ 5–8. Indeed, the withheld documents may have been persuasive, but nothing indicates they were persuasive enough to have operative effect. Accordingly, DOS demonstrated the withheld documents were drafted as legal advice rather than binding authority; they were not "post-decisional". Therefore, the withheld documents were not "working law".

Furthermore, nothing indicates that the government expressly adopted these documents or incorporated them by reference. Because the adoption process is usually internal and hidden from public view, "express adoption" cases in this Circuit generally

*Aircraft Eng'g Corp.*, 421 U.S. 168, 184, 95 S. Ct. 1491, 44 L. Ed. 2d 57 (1975)); *see also ACLU v. NSA*, 2017 U.S. Dist. LEXIS 44597, at *27 (S.D.N.Y. Mar. 27, 2017). There is no evidence the government adopted these advisory opinions as binding or explicitly relied upon them in a final decision. Essentially, nothing indicates the purported advice mutated into law.

In sum, the evidence suggests the government did not create the disputed documents as working law, never adopted them as working law, and never incorporated them by reference. *Sears*, 421 U.S. at 153 (emphasis added) (internal quotation marks and citation omitted); *see also Brennan Ctr.*, 697 F.3d at 201. Therefore, the deliberative process privilege applies to the disputed documents, and the DOS properly withheld them under Exemption 5.[18]

### III. DOS 7(e) Withholdings

#### A. Legal Standard

Exemption 7 protects the government from disclosing records or information "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). This includes records with "a rational nexus to the agency's law-enforcement duties, including the prevention of terrorism and unlawful immigration." *Chivers v. United States Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 387 (S.D.N.Y. 2014) (citation omitted).[19] Exemption 7(E) exempts from disclosure records that: 1) "would disclose techniques and procedures for

---

[18] The DOS also claimed the First Amendment Concerns Memorandum was protected by other privileges under Exemption 5. However, "the Court need not make redundant findings to justify non-disclosure." *Spadaro*, 2019 U.S. Dist. LEXIS 50273, at *7-8.

[19] "As the D.C. Circuit has explained, 'Law enforcement entails more than just investigating and prosecuting individuals after a violation of the law.' The 'ordinary understanding' of the term 'includes . . . proactive steps designed to prevent criminal activity and maintain security.'" *Human Rights Watch v. Dep't of Justice Fed. Bureau of Prisons*, No. 13 Civ. 7360, 2015 U.S. Dist. LEXIS 123592, 2015 WL 5459713, at *5 (S.D.N.Y. Sept. 16, 2015) (citation omitted) (quoting *Public Emples. for Envtl. Responsibilty v. United States Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203, 408 U.S. App. D.C. 61 (D.C. Cir. 2014)).

(redacting techniques used to check for terrorism-related ineligibilities). DOS contends that the purpose of the redacted FAM sections is to help enforce the INA and therefore "falls squarely within the Department's law enforcement functions" – specifically, its responsibilities to process visa applications. Suppl. Stein Decl. ¶ 9. Plaintiff contends the redacted sections appear to contain definitions and broad statements of law, which fall outside of the techniques, procedures, and guidelines subject to Exemption 7(E). *See* 5 U.S.C. § 552(b)(7)(E); *see also ACLU v. Dep't of Homeland Sec.*, 243 F. Supp. 3d 393, 403–04 (S.D.N.Y. 2017). The Court agrees with Plaintiff.

The redacted portions are within the FAM's "Definitions" section. DeCell Decl. Ex. B at 7. Furthermore, other portions of the FAM appear to contain "recitations of statutes and background" not subject to Exemption 7(E). For example, 9 FAM 302.6-2(B)(3) references nine examples of material support, including a "safe house," "[t]ransportation," and "[c]ommunications." This list derives from the INA definition for "engage in terrorist activity," which includes "to commit an act that the actor knows, or reasonably should know, affords material support." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Yet DOS completely withholds the context for these nine examples in the FAM, claiming that this paragraph "identif[ies] the situations that trigger the process of checking for terrorism-related ineligibilities and reveal[s] the techniques used during that process." *Vaughn* Index 1. The similarity between the withheld information and the INA's text, however, suggests Exemption 7(E) does not apply.

Moreover, DOS admits the FAM generally consists of "policy." The mere descriptions of codified law and policy, even those including "interpretation and application of immigration laws and regulations," *Vaughn* Index 1, are not protected

27

Plaintiff also asks the Court to conduct an *in camera* review of Defendants' withheld and redacted documents to determine whether the claimed exemptions are reasonable. Courts should only conduct *in camera* review of undisclosed records as a last resort. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224, 98 S. Ct. 2311, 57 L. Ed. 2d 159 (1978). Records should not be reviewed *in camera* as a substitute for requiring an agency to explain its claimed exemptions in accordance with *Vaughn. Am. Civil Liberties Union v. United States Dep't of Justice*, 210 F. Supp. 3d 467, 485 (S.D.N.Y. 2016) (quoting *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997, 331 U.S. App. D.C. 178 (D.C. Cir. 1998)). The Court finds that *in camera* review is unnecessary and Orders the Government to supplement its submissions in accordance with this Opinion.

## CONCLUSION

For the foregoing reasons, Defendants' partial motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's Cross Partial Motion for Summary Judgment is GRANTED in part and DENIED in part. The Clerk of Court is respectfully directed to terminate the Motion at docket entry 100.

**SO ORDERED.**

**Dated:** September 13, 2019
      **New York, New York**

                                              **ANDREW L. CARTER, JR.**
                                              **United States District Judge**