20-3837
Knight v. USCIS et al.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Apr 06 2022

# In the
# United States Court of Appeals
# For the Second Circuit

————————————

August Term, 2021
No. 20-3837

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY,
*Plaintiff-Appellee,*

*v.*

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, UNITED
STATES DEPARTMENT OF STATE, UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT,
*Defendants-Appellants,*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED
STATES DEPARTMENT OF JUSTICE, UNITED STATES CUSTOMS AND
BORDER PROTECTION,
*Defendants.*

————————————

On Appeal from the United States District Court for the Southern
District of New York

————————————

ARGUED: JANUARY 6, 2022
DECIDED: APRIL 6, 2022

Before: JACOBS, RAGGI, and NARDINI, *Circuit Judges*.

————————————

Defendants-Appellants United States Citizenship and Immigration Services, United States Department of State, and United States Immigration and Customs Enforcement appeal from three orders of the district court requiring them to produce documents in response to requests from Plaintiff-Appellee the Knight First Amendment Institute at Columbia University under the Freedom of Information Act. The district court (Andrew Carter, *J.*) ordered disclosure of three sets of documents: (1) portions of Volume 9 of the Foreign Affairs Manual; (2) the questions that are used to determine whether to apply the "Terrorism Related Inadmissibility Ground" to applicants for immigration benefits; and (3) a memo titled "ICE Ability to Use 212(a)(3)(C) Foreign Policy Charge." We hold that the Department of State and United States Citizenship and Immigration Services properly withheld the first two sets of documents under FOIA Exemption 7(E). We therefore REVERSE the orders of the district court requiring disclosure of those materials. With respect to the third, it is unclear whether the agency has already complied fully with the district court's order, in which case its appeal would be moot. Accordingly, we REMAND to allow the parties to further develop the record.

————————————

CATHERINE CRUMP (Megan Graham, Samuelson Law, Technology & Public Policy Clinic, U.C. Berkeley School of Law, Berkeley, CA, Xiangnong Wang, Carrie DeCell, Alex Abdo, Jameel Jaffer, Knight First Amendment Institute at Columbia University, New York, NY, *on the brief*),

Samuelson Law, Technology & Public
Policy Clinic, U.C. Berkeley School of Law,
Berkeley, CA, *for Plaintiff-Appellee.*

ELLEN BLAIN, Assistant United States
Attorney (Sarah S. Normand, Benjamin H.
Torrance, Assistant United States Attorneys
*on the brief*), *for* Audrey Strauss, United
States Attorney for the Southern District of
New York, New York, NY, *for Defendants-
Appellants*.

————————————

WILLIAM J. NARDINI, *Circuit Judge*:

The Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"),
enacted in 1966, allows citizens to find out what their government is
up to. FOIA embodies a strong policy in favor of disclosing materials
in response to citizens' requests. In some circumstances, though,
Congress has determined that other interests—such as personal
privacy, national security, or foreign policy—outweigh the need for
transparency. These circumstances are embodied by a limited set of

statutory exemptions from FOIA's disclosure requirements.  This case requires us to determine the scope of one such exemption.

Defendants-Appellants United States Citizenship and Immigration Services ("USCIS"), United States Department of State ("DOS"), and United States Immigration and Customs Enforcement ("ICE") appeal from three orders of the United States District Court for the Southern District of New York (Andrew Carter, *J.*) entered on September 13, 2019, September 23, 2019, and September 13, 2020, requiring them to produce certain documents in response to FOIA requests from the Knight First Amendment Institute at Columbia University ("Knight").  Knight requested documents concerning the agencies' interpretation and implementation of provisions of the Immigration and Nationality Act ("INA") that allow exclusion of aliens from the United States based on the aliens' connections to or endorsement of terrorist activity.  The parties have resolved several of Knight's requests, leaving only three sets of documents at issue on

appeal: (1) portions of Volume 9 of the Foreign Affairs Manual; (2) the questions that USCIS uses to determine whether to apply the "Terrorism Related Inadmissibility Ground" to applicants for immigration benefits; and (3) an ICE memo titled "ICE Ability to Use 212(a)(3)(C) Foreign Policy Charge." We hold that DOS and USCIS properly withheld the first two sets of documents under FOIA Exemption 7(E). With respect to the third, the record is unclear as to whether ICE has already complied fully with the district court's order, which would render its appeal moot. We therefore remand for further proceedings on that issue.

## BACKGROUND

### I. Knight's Freedom of Information Act Request

The INA governs immigration and citizenship in the United States. *See* 8 U.S.C. ch. 12. Section 212 of the INA excludes from admission to the U.S. any alien who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or

support a terrorist organization[,]" 8 U.S.C. § 1182(a)(3)(B)(i)(VII), or who is "a representative . . . of . . . a political, social, or other group that endorses or espouses terrorist activity[,]" *id.* § 1182(a)(3)(B)(i)(IV)(bb) (together, the "endorse-or-espouse provisions"). The INA also excludes aliens whose admission the Secretary of State "has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1182(a)(3)(C)(i) (the "foreign-policy provision"). An alien is not excludable "because of the alien's past, current, or expected beliefs, statements, or associations . . . [that] would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C)(iii).

On August 7, 2017, Knight filed FOIA requests with several executive agencies, including DOS, USCIS, and ICE. Knight asserted

that its FOIA requests were prompted by President Donald Trump's statements and executive orders related to the above-described INA provisions. Specifically, President Trump purportedly stated his intention to institute an "'ideological screening test' for admission into the United States and said that a 'new screening test' involving 'extreme, extreme vetting' was overdue." Joint App'x at 37 (quoting Karen Deyoung, *Trump Proposes Ideological Test for Muslim Immigrants and Visitors to the U.S.*, Wash. Post (Aug. 15, 2016), https://perma.cc/G9SCEPHT). President Trump subsequently issued two executive orders that are at issue here: Exec. Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017) and Exec. Order No. 13780, 82 Fed. Reg. 13209, 13215 (Mar. 6, 2017) (together, the "Executive Orders").

The Executive Orders directed executive departments, including DOS and the Department of Homeland Security (under which USCIS and ICE fall), to develop a more robust vetting program for immigrants entering the country. They required "the

development of a uniform baseline for screening and vetting standards and procedures" and processes to "ensur[e] the proper collection of all information necessary for a rigorous evaluation of all grounds of inadmissibility."  Exec. Order No. 13780, 82 Fed. Reg. at 13215.[1]

Knight sought several categories of records related to the way that agencies interpreted and implemented the endorses-or-espouses provisions and the foreign-policy provision of the INA under the Executive Orders. The agencies released a substantial volume of material in response to Knight's request but withheld some documents in whole or in part under various FOIA exemptions.  For example, USCIS produced 957 pages in their entirety but withheld 357 pages.  The parties resolved most disputes about the scope of the

---

[1] President Joseph Biden revoked the Executive Orders on the first day of his administration.  *See* Proclamation No. 10,141, 86 Fed. Reg. 7005 (Jan. 20, 2021). Knight asserts that it maintains an interest in the material it requested because of "the expanded focus on social media accounts in immigration vetting in recent years, and the Biden Administration's active review and reconsideration of these policies."  Knight Br. at 8.

agencies' withholding between themselves, and Knight filed suit seeking an order requiring the agencies to produce a subset of the documents about which the parties were unable to agree. Before the district court, the parties filed cross-motions for partial summary judgment. Three sets of records addressed in the district court's rulings on those motions remain at issue in this appeal: (1) portions of Volume 9 of the Foreign Affairs Manual ("9 FAM"); (2) a set of training slides, manuals, and guides containing questions relating to the Terrorism Related Inadmissibility Grounds (the "TRIG questions"); and (3) an ICE memorandum titled "ICE Ability to Use 212(a)(3)(C) Foreign Policy Charge" (the "ICE memo").

The court addressed the 9 FAM records in its September 13, 2019, ruling on the parties' first cross-motions for summary judgment. It addressed the TRIG questions and the ICE memo in its September 23, 2019, ruling on the parties' second cross-motions for summary judgment. And it addressed the parties' additional arguments related

to the 9 FAM records and TRIG questions in its September 13, 2020, ruling on the government's motion for clarification and reconsideration.

### A.    Three Sections of the Foreign Affairs Manual

Knight requested "[a]ll Foreign Affairs Manual sections (current and former) relating to the endorse or espouse provisions or the foreign policy provision, as well as records discussing, interpreting, or providing guidance regarding such sections."  Joint App'x at 39.

DOS describes the Foreign Affairs Manual and the associated Handbooks as

> a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies.  The FAM (generally policy) and the [Foreign Affairs Handbooks] (generally procedures) together convey codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive and Department mandates.

DOS, *Foreign Affairs Manual and Handbook*, https://fam.state.gov [https://perma.cc/5JJC-TKC6] (last visited Mar. 22, 2022).

DOS provided relevant portions of the manual to Knight but redacted certain sections of 9 FAM. In general, 9 FAM includes "directives and guidance" for DOS personnel adjudicating U.S. visas. 9 FAM 101.1. DOS asserted that the redacted portions of the manual were exempt from disclosure under Exemption 7(E).[2] Versions of three partially redacted sections remain at issue: 9 FAM 302.6, 9 FAM 40.32, and 9 FAM 302.14.

- **Eight versions of 9 FAM 302.6.** DOS redacted eight versions of 9 FAM 302.6, titled "Ineligibilities Based on Terrorism Related Grounds." Joint App'x at 66. It asserted that the redacted

---

[2] Exemption 7(E) excludes from the disclosure requirement "records or information compiled for law enforcement purposes [the release of which] . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

portions "disclose law enforcement investigation techniques, procedures, and guidelines." *Id.* Its *Vaughn* index[3] lists each redaction and explains how the redaction falls within the exemption. For example, "9 FAM 302.6-2(B)(1)(b). reveals interagency cooperation procedures during the process of checking for terrorism-related ineligibilities," *id.*; and "9 FAM 302.6-2(B)(4)e. (2) and (5) gives guidelines for when spouses and children trigger the requirement for further security investigation and how to conduct that process," *id.* at 67. DOS concluded that "[d]isclosure of any of the above information could reasonably be expected to risk circumvention of the law

---

[3] As we have explained:

> The *Vaughn* index procedure was developed to avoid the cumbersome alternative of routinely having a district court examine numerous multi-page documents *in camera* to make exemption rulings. *See Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C. Cir. 1973). . . . A *Vaughn* index typically lists the titles and descriptions of the responsive documents that the Government contends are exempt from disclosure. In some cases detailed affidavits from agency officials may suffice to indicate that requested documents are exempt from disclosure.

*N.Y. Times Co. v. U.S. Dep't of Just.*, 758 F.3d 436, 438–39 (2d Cir.), *supplemented by* 762 F.3d 233 (2d Cir. 2014) (footnotes omitted).

because terrorists and other bad actors could use it to conceal
derogatory information, provide fraudulent information, or
otherwise circumvent the security checks put in place to ensure
that terrorists and other bad actors cannot gain visas into the
United States." *Id.* at 68.

- **Three versions of 9 FAM 40.32**. DOS redacted three versions
  of 9 FAM 40.32, which it reports are "earlier iterations of
  sections that are now incorporated into 9 FAM 302.6." *Id.* As
  with 9 FAM 302.6, DOS provided an explanation for each
  redaction. It provided the same conclusion for withholding as
  with 9 FAM 302.6 (that is, disclosure could allow terrorists or
  other bad actors to circumvent the law).

- **One version of 9 FAM 302.14**. DOS made several redactions to
  one version of 9 FAM 302.14, titled "Ineligibility Based on
  Sanctioned Activities." *Id.* at 69. It asserted that the redacted
  portions "disclose law enforcement investigation techniques,

procedures, and guidelines" about several topics. *Id.* For example, it stated that the redacted portions included "guidelines for conducting the security investigation process, including whether certain procedures are mandatory, and what information to include in a request for those procedures." *Id.*

The district court held that 9 FAM was not "'compiled for law enforcement purposes' even if some sections of the FAM may serve those purposes." *Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 311, 332 (S.D.N.Y. 2019) ("*Knight I*"). Because DOS is a "mixed-function agency" performing both administrative and law enforcement functions, the court explained it would "'scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under FOIA

Exemption 7.'"  *Id.* (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002)).[4]

First, the district court noted that some of the redacted portions fell within the "Definitions" section of 9 FAM and that that section appeared to derive from definitions included in the INA.  *Id.* at 332–33. The district court thus held that "[t]he similarity between the withheld information and the INA's text . . . suggests Exemption 7(E) does not apply."  *Id.* at 333.

Second, DOS admitted that the FAM "generally consists of policy."  The district court agreed, observing that "mere descriptions of codified law and policy, even those including interpretation and application of immigration laws and regulations, are not protected under Exemption 7(E)."  *Id.* at 333 (internal quotation marks and citations omitted).  Rather, "[t]o be 'compiled for law enforcement

---

[4] We have frequently noted the District of Columbia Circuit's "particular FOIA expertise" and looked to its decisions for guidance in interpreting the FOIA.  *See, e.g.*, *Whitaker v. Dep't of Commerce*, 970 F.3d 200, 206 & n.25 (2d Cir. 2020).

purposes,' the information must go a step further and describe 'proactive steps' for preventing criminal activity and maintaining security." *Id.* (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring)).

Finally, the court noted that some records appeared to contain "interpretive information" which DOS characterized as "guidelines," and held that this type of interpretive document falls outside of Exemption 7(E). *Id.* For example, DOS's description of 9 FAM 302.6-3(B) explained that it included "guidelines for situations in which an individual may cease to be inadmissible." *Id.* (internal quotation marks omitted). The court held that it was not clear "how explaining to the public what may constitute grounds for inadmissibility—essentially a legal interpretation—may potentially help an individual circumvent the law." *Id.*

Based on the above conclusions, the district court ordered disclosure of the unredacted versions of the three 9 FAM sections at issue. *Id.*

### B.     Terrorism-Related Inadmissibility Ground Questions

Next, Knight requested "[a]ll records containing policies, procedures, or guidance regarding the application or waiver of the endorse or espouse provisions or the foreign policy provision."  Joint App'x at 39.  In response, USCIS disclosed several presentation slides, training manuals, and other guides.   In some documents, USCIS redacted "model or sample questions for immigration officers to use when screening applicants."  *Id.* at 552.  The questions are intended to help determine, for example, "whether an applicant provides material support for terrorism, and to determine whether an applicant provides support to a terrorist organization under duress." *Id.*  The agency explained that the process for asking the questions is dynamic.  The withheld material includes not only "TRIG specific

model questions that USCIS immigrations officers should ask when interviewing applicants," but also "follow-up questions that immigration officers should ask when they spot issues in testimony that could trigger a TRIG bar." Joint App'x at 181–82.

USCIS asserted that the TRIG questions "reflect specialized methods that USCIS has refined through its decades of enforcing United States immigration laws." *Id.* The agency asserted that the TRIG questions were therefore exempt from disclosure under Exemption 7(E).

The district court concluded that the TRIG questions were not "special or technical." *Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 334, 353 (S.D.N.Y. 2019) ("*Knight II*"). It also explained that those questioned using the TRIG questions would necessarily learn the questions, and "USCIS submit[ted] no evidence suggesting its methods are so special that interviewees cannot parrot them to whomever they choose." *Id.* at

354. The court therefore concluded that Exemption 7(E) did not apply. *Id.*

### C.  Memorandum Titled "ICE Ability to Use 212(a)(3)(C) Foreign Policy Charge"

Knight made several requests for legal or policy memoranda related to the foreign policy provision.  ICE identified as responsive a memorandum titled "ICE Ability to Use 212(a)(3)(C) Foreign Policy Charge."  It redacted the memorandum in full except for the title.

ICE stated that the memorandum "contains information protected by the attorney-client privilege.  The materials reflect opinions, analysis, guidance and legal advice provided by attorneys in the ICE Office of the Principal Legal Advisor (OPLA), regarding a particular section of the INA."[5]  Joint App'x at 249.  In a separate declaration submitted in support of summary judgment, ICE supplemented its description, further stating that the memo "includes

---

[5] ICE initially claimed attorney-client privilege over the memo but withdrew that assertion during summary judgment proceedings.  Appellants' Br. at 13 n.4.

a brief summary with notes and quotes for determining whether Section 212(a)(3)(C) can be used by the Secretary of State as grounds for inadmissibility."  Joint App'x at 563.  It asserted that "th[e] document did not bind the agency[,]" was "not organized like typical ICE memoranda[,] and [was] not signed by or formally addressed to ICE leadership.  The memorandum simply supplie[d] factors for consideration while providing analysis on whether the Secretary of State should use Section 212(a)(3)(C) Foreign Policy Charge to render an alien inadmissible under the INA."  *Id*.  Thus, ICE withheld the memo under Exemption 5 and the deliberative process privilege.[6]

The district court found that ICE had failed to establish that the ICE memo was subject to the deliberative process privilege through Exemption 5.  Specifically, the court found the document was not "pre-decisional" because ICE did not show that the memo "'formed

---

[6] Exemption 5 provides that disclosure is not required for "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).

an essential link in a specific consultative process, reflects the personal opinions of the writer *rather than* the policy of the agency, [or] if released would inaccurately reflect or prematurely disclose the views of the agency.'"  *Knight II*, 407 F. Supp. 3d at 345 (quoting *Brennan Ctr. for Just. at N.Y. Univ. Sch. of Law v. U.S. Dep't of Just.*, 697 F.3d 184, 202 (2d Cir. 2012) (emphasis added by district court)).  The memo appeared "more akin to opinions regarding how to *interpret* policy rather than recommendations as to how to *make* policy."  *Id.*  It was therefore "post-decisional explanation" rather than "pre-decisional advice" and fell outside of Exemption 5.  *Id.*  (internal quotation marks omitted).  The district court therefore directed ICE to "disclose reasonably segregable portions of [the ICE memo] that reflect current immigration policy."  *Id.*  at 345–46.

D.    **Motion for Reconsideration**

After the district court decided *Knight I* and *Knight II*, DOS and USCIS moved for reconsideration and clarification of the court's

21

decisions with respect to 9 FAM and the TRIG questions, respectively.

*Knight First Amendement Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, No. 1:17-CV-7572, 2020 WL 5512540, at *6 (S.D.N.Y. Sept. 13, 2020) ("*Knight III*"). The agencies requested clarification as to whether the district court intended to order immediate disclosure of the records, or to provide the agencies an opportunity to further justify the application of Exemption 7(E). *Id.* at *6. In the event that the court intended to require immediate disclosure, the agencies asked the court to reconsider and instead review the documents *in camera*. *Id.*

The court clarified that it intended to order immediate disclosure of the Exemption 7(E) documents and declined the invitation to conduct *in camera* review. *Id.* at *7–*8. It explained that "DOS and USCIS submitted sufficiently detailed justifications for withholding the FAM sections and TRIG questions respectively," but

that it "understood the agencies' arguments and was not persuaded." *Id.* at *8.

## DISCUSSION

We review the grant of summary judgment *de novo*.  *See Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012).

FOIA is premised on "a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. F.B.I.*, 181 F.3d 279, 286 (2d Cir. 1999).  Agencies are required to disclose requested documents unless they fall within an enumerated exemption.  *Id.* at 286–87.  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing . . . that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994).  "Summary judgment is appropriate where the agency declarations describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record or by evidence of agency bad faith . . . . Thus, the agency's justification is sufficient if it appears logical and plausible." *Am. C.L. Union v. U.S. Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018), *as amended* (Aug. 22, 2018) (cleaned up).

## I.    Documents Withheld under FOIA Exemption 7(E)

DOS withheld the 9 FAM records, and USCIS the TRIG questions, under FOIA Exemption 7(E).  That exemption excludes documents from FOIA's disclosure requirement if an agency satisfies two conditions.  First, the agency must show that the records were "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7). Second, the agency must show that the records either (1) "would disclose *techniques and procedures* for law enforcement investigations or prosecutions"; or (2) "would disclose *guidelines* for law enforcement investigations or prosecutions" *and* "such disclosure could reasonably be expected to risk circumvention of the law." *Id.* at

24

§ 552(b)(7)(E) (emphasis added).  Thus, to withhold "guidelines for law enforcement," an agency must make an additional showing that is not required before withholding "techniques or procedures."

### A.   DOS established that the 9 FAM materials are exempt from disclosure under Exemption 7(E)

Knight argues that DOS has failed to establish that the 9 FAM materials were "compiled for law enforcement purposes" or that they include "techniques or procedures" or "guidelines" for law enforcement whose disclosure would risk circumvention of the law. We disagree.

### 1.  The 9 FAM material was compiled for law enforcement purposes

"The threshold requirement for qualifying under Exemption 7 turns on the purpose for which the document sought to be withheld was prepared."  *F.B.I. v. Abramson*, 456 U.S. 615, 624 (1982).  The Supreme Court has interpreted this requirement broadly.  For example, a document initially compiled for law enforcement purposes but later provided to a different, non-law-enforcement

agency may still fall within Exemption 7. *Id.* at 624–25. Still, an agency that performs both administrative and law-enforcement functions is "subject to an exacting standard when it comes to the threshold requirement of Exemption 7." *Tax Analysts v. I.R.S.*, 294 F.3d 71, 77 (D.C. Cir. 2002). DOS acknowledges that it is a "mixed-function" agency.

Knight argues that 9 FAM was not compiled for law enforcement purposes because it was compiled "to help an agency *apply* the law—in this case to process visa applications," which is "not a sufficient basis to conclude that the information was compiled to *enforce* the law." Knight Br. at 29 (citing *United Am. Fin., Inc. v. Potter*, 531 F. Supp. 2d 29, 46 (D.D.C. 2008)). But as Justice Alito has explained, "[t]he ordinary understanding of law enforcement includes not just the investigation and prosecution of offenses that have already been committed, but also proactive steps designed to prevent criminal activity and to maintain security." *Milner v. Dep't of*

*Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring). Enforcing the law always requires a degree of analysis and application. While some aspects of visa adjudication might fall outside the common understanding of "law enforcement," the provisions at issue here do not. DOS's explanations for its redactions clearly establish that the redacted provisions relate to the detection of connections to terrorism. *See, e.g.*, Joint App'x at 67 (summarizing reason for redactions, including "defin[ing] terrorist activity, adding specific details and clarification about how they fit into the security investigation process."). The detection and prevention of terrorism are archetypal law-enforcement purposes.

The district court concluded that the 9 FAM documents were not compiled for law enforcement purposes because they included "mere descriptions of codified law and policy" and "to be compiled for law enforcement purposes, the information must go a step further and describe proactive steps for preventing criminal activity and

maintaining security." *Knight I*, 407 F. Supp. 3d at 333 (internal quotation marks omitted). That view finds no support in the text of the exemption. The threshold inquiry under Exemption 7 is the reason for which material was compiled, and the material should be considered as a whole rather than broken into parts and scrutinized in isolation. While an agency's discrete description of law and policy might not be subject to exemption in every context, when a larger series of descriptions is compiled to provide comprehensive guidance to employees in the field on how to apply and enforce the laws within the agency's purview, that subsequent compilation enters the potential ambit of Exemption 7(E). An agency's compilation of laws and policies might provide insight into its conduct and approaches to law enforcement even if it reveals no "proactive steps." Such compilation might reveal the agency's reliance on specific laws, reflecting the use of certain techniques or the limitations on the implementation of those techniques in the field. Certainly, records

that reflect *only* descriptions of publicly available statutes are less likely to create a risk of "circumvention of the law" if released. 5 U.S.C. § 552(b)(7)(E). But that does not mean they were not "compiled for law enforcement purposes" in the first instance—only that they might not meet the requirements of Exemption 7(E) at the second step. Here, DOS has established that 9 FAM includes specific guidance to DOS employees on how to detect ties to terrorism. We conclude, therefore, that it was "compiled for law enforcement purposes" within the meaning of Exemption 7(E).

### 2. The 9 FAM materials would disclose techniques, procedures, or guidelines for enforcement

Knight next argues that, even if the records were "compiled for law enforcement purposes," some of DOS's redactions fall outside Exemption 7(E) because they do not cover material reflecting techniques or procedures for law enforcement investigations or prosecutions. Knight contends that the non-redacted portions of 9 FAM include only high-level summaries rather than techniques or

procedures. Some of the material "appears to consist of definitions and explanations of statutory language." Knight Br. at 34. And "some of the withheld materials appear to summarize publicly available statutes, memoranda, and directives." Knight Br. at 36. With each assertion, though, Knight asks us to draw inferences about the redacted material from context that are contradicted by DOS's affidavits and *Vaughn* index. On summary judgment, we accept an agency's affidavits as true unless they are "controverted by either contrary evidence in the record or by evidence of agency bad faith." *Am. C.L. Union*, 901 F.3d at 133 (internal quotation marks and alteration omitted). Accordingly, we cannot credit Knight's contentions about what the 9 FAM redactions "appear" to include in the face of an agency affidavit attesting to what they *actually do* include, particularly in the absence of evidence of bad faith. In any event, we are not persuaded that Knight's proposed inferences from context are reasonable. For example, Knight asserts it is "unlikely"

that redactions include more information than in publicly available sources because the redactions are relatively short.  Knight Br. at 37.  But DOS's *Vaughn* index explicitly states that some redactions include material that has not been publicly disclosed.  *See, e.g.*, Joint App'x at 67 (explaining that one redaction "lists credible sources of evidence that may be used in recommending a finding, *including sources that are not public knowledge*") (emphasis added).

Knight next argues that DOS's *Vaughn* index describes the redacted material as guidelines, while they now state in their brief that it reflects techniques or procedures.  "Techniques and procedures . . . refers to how law enforcement officials go about investigating a crime."  *Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) ("*Lowenstein Project*") (internal quotation marks omitted).  In contrast, "guidelines . . . generally refers in the context of Exemption 7(E) to resource allocation."  *Id.* (internal quotation marks omitted).   While law-enforcement documents

31

revealing techniques and procedures are exempt from disclosure *per se*, documents revealing guidelines are exempt only "if such disclosure could reasonably be expected to risk circumvention of the law." *Id.* at 681.

DOS's use of the word "guideline" in its *Vaughn* index is not talismanic. Rather, we must consider the substance of the agency's descriptions to determine whether the redacted material contains "techniques or procedures" or "guidelines" under FOIA. The phrase "techniques or procedures" is not defined in the statute, and we have not ascribed to it a hypertechnical meaning. *Lowenstein Project*, 626 F.3d at 682. Stated simply, "techniques or procedures" includes both law enforcement methods—the actions that law enforcement personnel take to identify and neutralize bad actors—as well as the triggers for the application of methods. *See, e.g.*, *id.* (describing as a "technique or procedure" an agency's instruction to agents to focus on cash-based businesses for audit and investigation).

Here, we need not decide whether the 9 FAM material is properly categorized as "techniques or procedures" rather than "guidelines" for law enforcement. Even assuming the more rigorous "guideline" standard applies, DOS has established that disclosure of the 9 FAM material could reasonably risk circumvention of the law. As DOS describes, the redactions to 9 FAM are targeted to those specific provisions that delineate how DOS officials should identify aliens who may have connections to terrorism, including some specific triggers for additional scrutiny. Releasing this information would allow an individual with actual terrorist ties to better tailor his or her application to avoid detection. It does not matter, then, whether the redactions reflect "techniques or procedures" or "guidelines." Exemption 7(E) would apply in either case.

Finally, Knight urges that the *Vaughn* index is too "vague and conclusory" to support DOS's withholding. Knight Br. at 40. To justify withholding, an agency must provide "a relatively detailed

analysis of the withheld material in manageable segments without resort to conclusory and generalized allegations of exemptions." *Halpern*, 181 F.3d at 290 (internal quotation marks and alteration omitted). The agency must also "provide an indexing system that would subdivide the withheld document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification." *Id.* (internal quotation marks and alteration omitted). In *Halpern*, for example, we held that an agency's affidavit was sufficient where it provided a high-level explanation of categories of information falling within the exemption, and then cross-referenced each of those categories against redactions in the requested documents. *Id.* at 296–98. Here, too, we conclude that DOS satisfied its obligation to provide a detailed overview of the withheld material. DOS's redactions are highly targeted and discrete. *See, e.g.*, Joint App'x at 128 (redacting two sentences on a page). In this context, it would not be reasonable to expect DOS to provide more specific

descriptions; doing so would effectively require disclosure of the isolated material it chose to redact. And the agency here went further than *Halpern* would require, providing separate, detailed explanations for each redaction.

In sum, we hold that DOS met its burden to establish that the 9 FAM materials were compiled for law enforcement purposes; that they reflect techniques, procedures, or guidelines of law enforcement; and that disclosure would reasonably risk circumvention of the law. Accordingly, we reverse the September 13, 2019, ruling of the district court insofar as it required DOS to disclose unredacted versions of the 9 FAM materials.

### B. USCIS established that the TRIG questions are exempt from disclosure under Exemption 7(E)

We turn next to the TRIG questions. [7] The district court concluded that the TRIG questions are not subject to Exemption 7(E),

---

[7] The district court did not address whether the TRIG questions were compiled for law enforcement purposes. *Knight II*, 407 F. Supp. 3d at 353. Knight does not argue

but USCIS argues this was error.  It asserts that the TRIG questions constitute techniques or procedures of law enforcement, and that releasing them would enable applicants with ties to terrorism to better tailor their answers to avoid detection.  Knight responds that the TRIG questions are not sufficiently specialized to constitute techniques and procedures of law enforcement, that they are effectively public given that they have been asked of many aliens already, and that USCIS has not established that disclosure of the TRIG questions would risk circumvention of the law.  We hold that the TRIG questions constitute "techniques or procedures" of law enforcement, and in any event, their disclosure would reasonably risk circumvention of the law.  Our conclusion is not altered by the possibility that some individual aliens may have been asked some or all of the questions.

---

on appeal that they were not. Accordingly, we have no occasion to question whether USCIS has met its burden at the first step of analysis under Exemption 7(E).

The district court found that the TRIG questions were not "techniques or procedures" because "USCIS [had] not demonstrate[d] its methods are necessarily special or technical." *Knight II*, 407 F. Supp. 3d at 353. Knight further contends that the government must demonstrate that the material it withholds includes "'*specialized, calculated* technique[s] or procedure[s].'" Knight Br. at 39 (quoting *Am. C.L. Union Found. v. Dep't of Homeland Sec.*, 243 F. Supp. 3d 393, 404 (S.D.N.Y. 2017) ("*ACLU v. DHS*") (emphasis added). But as noted earlier, the phrase "techniques or procedures" refers simply to "how law enforcement officials go about investigating a crime." *Lowenstein Project*, 626 F.3d at 682 (defining "technique" as "a technical method of accomplishing a desired aim"; and "procedure" as "a particular way of doing or of going about the accomplishment of something" (internal quotation marks omitted)). Our analysis is not advanced by adding qualifiers that do not appear in the statute— such as "special," "specialized," "technical," or "calculated"—to

modify the terms "techniques or procedures."  It is not the province of the courts to add words to statutes that Congress has enacted. To the extent that the district court's decision could be understood to suggest that Exemption 7(E) covers only a subset of "techniques or procedures," we therefore reject such a reading of the statute.  And in any event, we do not think that any of those four adjectives materially aids our analysis of what falls within the scope of "techniques or procedures." [8]  The key issue in determining whether redacted material contains "techniques or procedures" under Exemption 7(E) is whether disclosure of that material would reveal particulars about the way in which an agency enforces the law and the circumstances that will prompt it to act.  In *Lowenstein Project*, we explained, "if [an] agency informs tax investigators that cash-based business are more

_____

[8] Indeed, we have used the word "technical" parenthetically in describing the definition of "technique." *Lowenstein Project*, 626 F.3d at 682, and so it would be redundant to speak of a "technical technique."  Moreover, "technical" in this context simply means "of or relating to a particular subject." *Webster's Third New International Dictionary* (1986).

likely to commit tax evasion than other businesses, and therefore should be audited with particular care, focusing on such targets constitutes a 'technique or procedure' for investigating tax evasion." 626 F.3d at 682. The questions that USCIS instructs its employees to ask visa applicants to detect ties to terrorism are more closely linked to the specific methods employed by government actors than an agency's generic directive to investigate cash-based businesses. We hold that the list of TRIG questions employed to effectuate law enforcement purposes—to identify potential terrorists and keep them from entering the United States—falls squarely within the scope of the statutory phrase "techniques or procedures."

Even if the TRIG questions were "guidelines" rather than "techniques or procedures" of law enforcement, Exemption 7(E) would apply because USCIS has established that disclosing the TRIG questions would reasonably risk circumvention of the law. As explained earlier, disclosing in advance the specific questions that

agents may use to suss out and evaluate connections to terrorism would help those with terrorist ties to tailor their answers to avoid detection. *See, e.g.*, *Heartland Alliance Nat'l Immigrant Justice Ctr. v. Dep't of Homeland Sec.*, 840 F.3d 419, 421 (7th Cir. 2016) (upholding the application of Exemption 7(E) to a list of lower-level terrorist organizations, the disclosure of which would allow applicants for immigration benefits to conceal ties to those organizations); *Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134, 143 (D.D.C. 2018) (upholding the application of Exemption 7(E) to "USCIS's Refugee Application Assessment" because "[t]he lines of questions recorded in the Assessment highlight circumstances that would have raised national security and public safety concerns," and its disclosure "could reasonably be expected to risk circumvention of the law by enabling applicants for refugee status to plan strategic but inaccurate answers").

Finally, Knight asserts, as the district court held, that even if the questions could be considered "techniques or procedures" for purposes of Exemption 7(E), they are no longer exempt because they have been publicly disclosed.  *See Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Rsrv. Sys.*, 463 F.3d 239, 249 (2d Cir. 2006). The burden of establishing prior public disclosure is on the requester. *Id.*  Knight asserts that it has carried its "burden of production" by pointing out that the TRIG questions "become known to applicants when the questions are asked in interviews or mailed to them in Requests for Evidence."  Knight Br. at 45.[9]  But as we have explained, "[t]he Supreme Court has limited the public domain exception to

---

[9] Knight invokes the district court's reasoning in *ACLU v. DHS*, asserting that when an agency has a "practice of asking the questions at issue," it incurs an additional burden to "justify its assertion that . . . [the questions are] not already known to the public."  Knight Br. at 46 (quoting *ACLU v. DHS*, 243 F. Supp. 3d at 402).  We reject any such rule.  A FOIA requester bears the burden of production on the question of whether material is "publicly available."  *Inner City Press*, 463 F.3d at 245.  As we explain above, the mere fact that an agency asks certain questions to certain individuals does not satisfy the requester's burden of production, because it does not satisfy the threshold showing that such questions are available to the general public.

information that is 'freely available.'" *Inner City Press*, 463 F.3d at 244

(quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S.

749, 764 (1989)).  Thus, to meet this prior-disclosure burden, "the

requesting party 'must . . . point[ ] to specific information in the public

domain that appears to duplicate that being withheld.'" *Id.* at 249

(quoting *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir.

1983) (alterations in original)).  In the FOIA context, information is in

the public domain if it is generally available to the public at large, not

simply if it happens to be known by select members of the public.  *See*

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 764

(1989) (distinguishing between information "restricted to . . . a

particular person or group of class of persons" and information

"freely available to the public").  The latter is the case here.  Perhaps

an enterprising researcher could identify a pool of visa applicants,

collect information about what they were asked, and then compile a

list of common questions they faced.  Though doubtful, let us further

assume that our imaginary researcher would also be able to intuit which questions had been posed to ferret out possible terrorists and therefore must be on the TRIG list. Even if all of this might conceivably be achieved, the necessity of the reconstruction exercise itself demonstrates that the information in question is not in the public domain. *See, e.g., Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (holding FOIA requester failed to show public disclosure by pointing to newspaper accounts establishing that government played tape recordings at trial; rather, requester had "burden of showing that there is a permanent public record of the exact portions" sought to be disclosed); *Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014) ("[C]ourts have acknowledged that Exemption 7(E) applies even when the identity of the techniques has been disclosed, but the manner and circumstances of the techniques are not generally known, or the disclosure of additional details could reduce their effectiveness." (internal

quotation marks omitted)); *Barouch v. United States Dep't of Just.*, 87 F. Supp. 3d 10, 30 n.13 (D.D.C. 2015) (upholding the application of Exemption 7(E) to material showing the "questioning techniques used by ATF agents and local law enforcement agents" because "disclosure would hinder future use of these tactics" (internal quotation marks omitted)).  Put another way, the possibility that a savvy law-evader might be able to infer the substance of some withheld documents by carefully observing an agency's actions does not remove those documents from the ambit of Exemption 7(E).[10]

For these reasons, we conclude that USCIS properly withheld the TRIG Questions under Exemption 7(E).  Those questions constitute techniques or procedures of law enforcement.  We therefore reverse the September 23, 2019, ruling of the district court

---

[10] That is particularly so where, as here, the withheld material does not include a single script that a motivated observer could discern.  The agency instructs its agents to use the TRIG questions dynamically: they may be scrambled, added, removed, or rephrased in response to the specific situation that agents face.

44

to the extent that it required USCIS to disclose material reflecting the TRIG Questions.

## II.    Documents Withheld under FOIA Exemption 5

ICE withheld under Exemption 5 a memo titled "ICE Ability to Use 212(a)(3)(C) Foreign Policy Charge."  The agency emphasizes that the memo was a draft, that it was not binding, and that it reflected the views of the individual author rather than the agency.  ICE argues that the district court erred in holding that the ICE memo was not subject to the deliberative process privilege through Exemption 5. That exemption excludes from FOIA's disclosure requirement "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5. U.S.C. § 552(b)(5).  "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges," including the deliberative process privilege.  *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991)  A record is protected

by the deliberative process privilege if it is (1) "predecisional, that is,
prepared in order to assist an agency decisionmaker in arriving at his
decision"; and (2) "deliberative, that is, actually related to the process
by which policies are formulated." *Id.* (cleaned up). "[T]he
deliberative process privilege protects only those records that bear on
the formulation or exercise of policy-oriented judgment." *Nat. Res.
Def. Council v. U.S. E.P.A.*, 19 F.4th 177, 184–85 (2d Cir. 2021) (internal
quotation marks omitted). But the agency need not point to a specific
decision that it was facing for which the document was prepared—it
is enough that the record is connected to "a specific decisionmaking
process." *Id.* at 192.

It appears that ICE's appeal with respect to the ICE memo
might be moot, but the record is unclear. Although the district court
concluded that the ICE memo did not fall within Exemption 5 because
it was not pre-decisional, *Knight II*, 407 F. Supp. 3d at 345, it did not
order immediate disclosure of the memo. Rather, it directed ICE to

"re-assess its applied exemptions" using the district court's opinion as a guide "and disclose all responsive non-exempt materials that can reasonably be segregated from exempt materials." *Id.* at 355. The record does not reveal whether or when ICE conducted the ordered segregability analysis. At oral argument, counsel for ICE stated that the agency had conducted a review and determined that no material was reasonably segregable, but it seemed that counsel might have been referring to a different memo that the district court had addressed in the same opinion.[11] While Knight now asserts that "ICE failed to disclose reasonably segregable portions of the Foreign Policy Provision Memo," Knight Br. at 57, it did not raise that failure in the district court, nor has it filed its own cross-appeal.

---

[11] Counsel explained that the district court ordered ICE to disclose anything in the memo that was "working law. ICE did that. ICE went through, did another review, and informed the plaintiffs that nothing in [the memo] contains working law." Oral Argument at 36:59–37:09, *Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs.*, No. 20-3837-cv (2d. Cir. Jan. 6, 2022). But the district court discussed "working law" in the context of a different ICE memo—the so-called "Extreme Vetting Memo" that is not at issue in this appeal. *See Knight II*, 407 F. Supp. 3d at 344.

Because we cannot determine whether ICE complied with the district court's direction to conduct a segregability analysis, we remand to the district court to allow the parties to develop the record. On remand, if it has not already done so, ICE must conduct a segregability analysis and communicate its position with respect to the ICE memo to Knight. If ICE determines that it is not obligated to produce any further portions of the ICE memo, Knight is free to challenge that determination in the district court. The district court should consider any such renewed dispute in light of our decision expounding upon the deliberative process privilege in *National Resources Defense Council*, 19 F.4th 177, which we decided only after the district court issued its prior ruling. Should the court have doubts about the application of Exemption 5 to the ICE memo, it may also conduct an *in camera* review. And, of course, either party remains free to appeal anew in the face of an adverse ruling.

## CONCLUSION

In sum, we hold as follows:

(1) DOS properly withheld portions of 9 FAM under FOIA
Exemption 7(E) because it established that the material was
compiled for law enforcement purposes and that disclosure
would reasonably risk circumvention of the law.

(2) An agency need not show that the techniques or procedures
of law enforcement that it seeks to protect from disclosure
under FOIA Exemption 7(E) are special or technical before
the Exemption applies, and material does not fall outside
Exemption 7(E) solely because some targets of investigation
could infer some of the contents of the material.
Accordingly, USCIS properly withheld the TRIG questions
under FOIA Exemption 7(E).

(3) It is not clear from the record whether ICE has already
complied with the segregability analysis ordered by the

district court with respect to the memo withheld pursuant
to Exemption 5, and whether ICE's appeal in that respect is
now moot.

We therefore REVERSE the orders of the district court to the
extent that they required disclosure of the 9 FAM materials and the
TRIG questions. We REMAND to the district court to allow the
parties to more fully develop the record with respect to the ICE
memo.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

50